485 So.2d 578 (1986)
Elton J. KING; Nancy H. King
v.
STATE FARM MUTUAL AUTOMOBILE INS. CO., Mandy C. Kelly et al.
Nos. CA 3351, CA 3352.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1986.
Writ Denied May 12, 1986.
*579 Victoria Lennox Bartels, William F. Wessel, Wessel, Bartels & Ciaccio, New Orleans, for Nancy H. King.
Joseph W. Thomas, New Orleans, for Elton J. King.
C. Gordon Johnson, Jr., Page McClendon Michell, Porteous, Toledano, Hainkel & Johnson, New Orleans, for Mandy C. Kelly and State Farm Mut. Ins. Co.
Timothy G. Schafer, Schafer & Schafer, New Orleans, for Linda and Donald Nicholson and United Services Auto. Ass'n.
Before REDMANN, C.J., and BARRY and LOBRANO, JJ.
REDMANN, Chief Judge.
Two children, ages seven and 11, were killed by an automobile when it left the highway to avoid hitting a van that had just entered the highway. The divorced parents of the children brought separate wrongful death actions against the vehicle drivers and insurers. The parents now appeal from a judgment that (1) dismissed the mother's action against the van's driver and its $200,000-limit insurer, while awarding her $300,000 against the automobile's driver and his father and (within their limits) his $10,000-limit insurer and the mother's own $25,000-limit uninsured motorist *580 insurer, and (2) dismissed the father's action against both drivers and their insurers on the basis that his damages were zero.
The question in the mother's appeal is the liability of the van driver, who, to make a left turn at a T-intersection with a six-lane highway with 19-foot median, after stopping in the median, crossed all the way into the third left-bound lane, providing the occasion for a 15-year-old driver in that lane (going perhaps 45 mph in a 40 mph zone) to drive over the right curb just 43' past the intersection to avoid hitting the van, and then to strike and kill the two children waiting for a bus 50' farther away.
The added question in the father's appeal is whether the jury was clearly wrong in fixing the father's damage from the wrongful deaths at zero because of the slight interest he demonstrated in the children during the six and a half years after his separation from their motheras by paying court-ordered child support only once during the last two years of their lives despite being regularly employed.
We reverse the dismissal of the van driver and her insurer from the mother's action but affirm the dismissal of the father's action.

I
The father sued for $100,000 for "loss of support, society, love and affection" and $150,000 for his grief. The children were about 15 months and four years eight months old when the parents separated, over six and a half years before the children's death. Although the father testified that he regularly paid child support from February 1974 until 1977, the mother testified that she had to take him to court. And, although he was regularly employed as a schoolteacher, he did not regularly contribute after 1977, but he did make one $75 payment to a Mobile court about five months before the October 3, 1980 death of the children. The mother testified that he saw the children seldom after the separation; he did not visit them during the last 23 months they were alive; he telephoned them once and wrote once in response to one's written request during their last two years.
It is the jury's function and province to evaluate the credibility of witnesses, and the jury plainly disbelieved the father's protestations of interest in and affection for the children. The jury does not, of course, have the authority to deny damages to a damaged parent as punishment for not paying child support. But not every biological parent is damaged by his or her child's death, and parents are only entitled to "the damages which they sustained through the wrongful death of the deceased," La.C.C. 2315. One who is little more than the legal and biological parent of a wrongly-killed child, without being a partner in a valuable parent-child relationship the destruction of which damages the parent, is not entitled to a monetary award for the death of the child. Mitt v. Security Ins. Co., 361 So.2d 465 (La.App. 4 Cir.1978), cert. denied 362 So.2d 1116.
Our facts are not so clear as those of Mitt, where the child, 17 at death, had been raised since age one not by the mother (much less by the legal father) but by the biological father and his family. Nevertheless our jury, by believing the mother and disbelieving the father, could reasonably have concluded that this father's relationship with his children was such that its destruction did not damage him to the extent that courts should grant him monetary recompense. In that conclusion, although it may be a close question, we cannot say, without having observed the witnesses, that the jury was "clearly wrong," as required to reverse by Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).

II
In its conclusion that the van driver was not negligent, on the other hand, the jury was clearly wrong (irrespective of whether, as appellants argue, the jury charge was erroneous).
Only 42'11" from the Crowder Boulevard southbound lane from which the van *581 turned left into the automobile's eastbound lane on Chef Menteur highway, the automobile had to climb the right curb off the highway to avoid hitting the van. (The car was unable to veer into the middle lane, apparently in part because the van was turning through the middle lanein violation of La.R.S. 32:101(3)'s command to turn into "the safest lane"but also because an otherwise unidentified black car was traveling in the middle lane.)
The extreme shortness of that distance proves the van driver's contributory fault in having turned into a lane when it was not safe to do so.
The clear explanation for the jury's clear error in failing to see fault so evident is the testimony of Duaine T. Evans. Evans's testimony, given as an expert, would place the automobile 1,048' away and able to stop in only 139' if traveling at the 40-mph speed limit when the van began to move into the intersection from its stop in the median.
That testimony must be rejected, first, because it is clearly wrong in calculating that critical distance on the basis that the automobile's speed of 45 mph is 75 (rather than 66) feet per second and, second, because it is based on two unsound assumptions that were provided (no doubt in good faith) by the lawyer for the van's driver and insurer.
The expert's own error of using 75 instead of 66 fps was presumably the result of a "slip of the finger" on his calculator. He explained that he multiplied mph by 1.4667 to get fps, but apparently he multiplied the 45 mph by 1.667, erroneously omitting the 4 of 1.4667, and thus obtained 75 instead of 66 fps. He used 75 throughout his critical calculations, which would have to be discarded on that score alone.
Moreover, the two assumptions that the lawyer gave the expert, both factual, were both inconsistent with or unsupported by the evidence and (as to the second) common experience, but were both used by the expert in calculating that 1,048' distance.
The first assumption was that, by the time the automobile caught up with the van, the automobile had traveled to a portable sign located 149'11" from the left southbound Crowder lane from which the van entered. The expert then calculated 179' as the distance the car would have traveled from the median to reach that 149'11" point, allowing for the crossing of Chef Menteur's eastbound lanes into the center of the far lane (a perpendicular distance of 29'3") on an assumed arc of a circle (which he calculated, unexplainedly, at 77'; a 90° arc of a circle with a 29'3" radius would be 45.95') plus an added distance to allow for starting from the center of the left southbound Crowder lane.
That first factual assumption ignores the physical evidence that the automobile left the highway only 42'11" away from the intersection at which the van entered the highway, and it also ignores the van driver's testimony, consistent with the 42'11" physical evidence, that after reaching the far lane she had traveled not "three or four lengths?" but "perhaps two or three lengths" of her Volkswagen van before she realized the automobile was passing on her right. A police officer estimated the length of the Volkswagen van at 14'. (We deem less reliable the driver's estimate of 20'. That would add only 12 to 18' in any event.) If the center of the front of the van had traveled two or three 14' lengths, 28 to 42', after reaching the center of the far lane on a circular path approximately 21' (29'3" radius less 8'3.5" distance to the middle of the left southbound Crowder lane) from the intersection, the front of the van would have been about 49 to 63' past the intersection at about the time that the automobile passed it on the right. The fact that the automobile went up on the curb 42'11" past the intersection to avoid hitting the van supports the inference that the rear of the van was not much farther past the intersection than 43' at that moment, and the front not much farther than 57'. Furthermore, if the speeds were 45 and 15 mph, as testified, then the automobile would travel three feet for every foot the van traveled. Thus, if the front of the van *582 were about 63'make it 64'from the intersection as the automobile passed it, as just estimated from the driver's testimony, then from the time the automobile hit the curb the van would have traveled about seven feet from its position at 57', while the automobile would have traveled 21' (3 × 7') from its position at 43'. Thus when the front of the van was at 64', the front of the automobile would have been at about 64' (43' + 21') from the intersection, about to pass the van.
It is true that the van driver also testified that she was near the portable sign when the automobile passed149'11" rather than 63' or so from the intersectionbut that testimony is not as consistent with the physical evidence that the automobile climbed the curb 42'11" from the intersection, as just shown. Thus the expert testimony, based on the assumption that the automobile passed the van at 149'11" past the intersection, was not well founded factually because of its failure to reconcile the van driver's internally inconsistent testimony with the conflicting physical evidence.
The second factual assumption that the expert accepted from the lawyer was so clearly wrong that the expert himself noted its wrongness. The assumption was that, instead of accelerating immediately to 15 mph and then continuing at that speed, the van driver would accelerate uniformly over the entire distance of 179' to the (wrongly) assumed point where the automobile passed. Speaking of the lawyer's instruction to so calculate, the expert testified:
"He said that it would accelerate to 15 mph in that distance. Well, I know that it can accelerate [to] far greater speeds within that distance."
That second assumption given to the expert by the lawyer is unsupported by any testimony by the van driver or any other evidence, and it is also contrary to common experience. But the expert obeyed instructions. He testified:
"If the van is traveling from zero speed to 15 mph it would have required [about] 16 seconds to travel that distance.... And if the [automobile] were traveling at 45 mph, that's seventy-five feet per second [sic; 66 fps is correct] for 16 seconds, this [75' × 16.27 seconds] comes out to be 1,220' [from the sign and] ... 1,048' [from mid-intersection].... Subtract 172' from 1,220 and you get 1,048."
Continuing, the expert testified that the automobile could have stopped with maximum braking within 139' if traveling at the speed limit of 40 mph (89' braking distance plus 50' reaction-time travel). The evident conclusion was that, because one can stop in 139' if traveling at the 40 mph limit and this automobile had 1,048' to stop, the automobile was exclusively to blame: and that was the jury's conclusion. We repeat that that conclusion is unsupported except by that expert's testimony, and that that testimony is itself unsupported by the record.
The second assumption under discussionthat acceleration or increase in speed was uniform from 0 to 15 mph over the entire distance of 179'is contrary to common experience. The assumption of uniform acceleration from zero has no other virtue in this case than that it makes it easy to calculate time taken to reach a given speed in a given distance. When acceleration is uniform the time (in seconds) equals the distance in feet divided by half the number of feet per second in the final speed. If acceleration were uniform from 0 to 15 mph over 179', requiring a time (as the expert testified) of 16.27 seconds, it would be far more gradual than the common experience of drivers. The acceleration would be (i.e., the speed would increase by) only 1.352' per second each second. At that acceleration, the distance traveled in the first second would be only .676', or eight inches. In the following seconds, as speed increased by 1.352' per second each second, it would be 2.028, 3.380, 4.732, 6.084'. In five seconds, the van would have moved only 16.9' under that acceleration. In the remaining seconds, it would travel about 7.4, 8.8, 10.1, 11.5, 12.8, 14.2, 15.5, 16.9, 18.3, 19.6, and 21', plus almost 6' in the final .27 seconds as it reached the speed of 22 fps, making *583 the total distance in 16.27 seconds the 179' assumed.
The common experience of persons who have driven an automobileespecially across three lanes of highway traffic going to work in the morningis that when one gives one's automobile gas to begin moving the automobile does not move only eight inches in one second, or only 17' in five seconds. The width of the fast lane on Chef Menteur at the intersection in question is 11'9": common experience is that it does not take over four seconds, even giving only a moderate amount of gas, to move across a 12-foot lane of highway from a stop. The lawyer's assumption of uniform acceleration is clearly wrongas, to repeat, even the expert acknowledged although he used that assumption as instructed.
The consequence is that the expert's conclusions based on three clearly wrong foundationsare clearly wrong.
This discussion of the van driver's negligence began by noting the short (and indisputable) distance of 43' from the van's entering the highway to the automobile's having to leave it. It is obvious that the van entered the automobile's lane when it was not safe to do so. But, so as not to say merely that that is obvious, we re-do the expert's calculationsalthough we are wary of all calculations from mere estimates of time, distance, and speed, because the inaccuracy of the estimates tends to be forgotten when they are overlaid with the accuracy of "scientific" calculations. We recalculate on assumptions that jibe, primarily, with the undisputed physical evidence, but also with the consistent testimony of the van driver and the common-experience assumption that the van accelerated normally to its intended final speed of 15 mph and then continued at that speed.
As detailed above in rejecting the first factual assumption that the lawyer gave the expert, the van's front would have been not 149'11" but on the order of 64' past the intersection when the automobile drew alongside. To reach that point, starting from the median at the middle of the extension of the left southbound Crowder lane, and assuming the path was an arc of a circle from that point to the center of the far Chef Menteur lane, the van would have traveled 45.95' in the arc of the turn, straightening out 29'3" not from the intersection but from the center of (the extension of) the left southbound Crowder lane, which is 8'3.5" east of the intersection. Thus on straightening out the front of the van would have been about 21' from the intersection, or 43' (about three 14' van lengths) from the critical 64' point. So its total travel to that latter point was about 89' (45.95'say 46'for the arc plus 43').
To travel 89' with uniform (which is minimum) acceleration to 15 mph would take only 8.1 seconds (89 divided by 11). To travel 89' with normal acceleration to, and then a steady speed of, 15 mph would take less: with maximum acceleration, about 4.6 seconds. We can calculate that time because we know the distance that maximum acceleration would require to reach 15 mph, from the testimony of the expert that it would take the van 12.5' with maximum negative acceleration (deceleration, from braking) to stop from 15 mph. The formula of distance divided by half of speed tells us that it would take the van only 1.136 seconds (12.5 divided by 11) to decelerate from 15 to 0 mph or (if the van's engine were capable of maximum acceleration) to accelerate from 0 to 15 mph, or 22 fps, in 12.5'. Because the van's total travel distance was only about 89' until overtaken, then after that 12.5' the van would have only 76.5' more to travel at a speed of 22 fps, so that only another 3.477 seconds would be required. Thus, if the van were capable of maximum acceleration and were accelerated at maximum acceleration up to 15 mph and then continued at a steady 15 mph, it would take only 4.613 seconds to reach the point where the automobile overtook it (if, indeed, the van driver's estimate of only 15 mph in morning rush-hour highway traffic be correct). During that 4.613 seconds, the automobile at 45 mph or 66 fps would have covered 304.5' to bring it 64' past the intersection: it would have *584 been only 241.5' away from the east side and only 208.5' away from the west side of Crowder southbound (itself a total of 33' wide) when the van started to pull out from the median.
The record does not support a conclusion that the Volkswagen van was capable of maximum acceleration. But the record does support, in the expert's testimony, a conclusion that the Volkswagen van was capable of far greater acceleration than the minimum forced upon the expert by the lawyer's good-faith but clearly wrong assumption. If one add a second or so to the van's travel time (increasing from 4.613 seconds minimum to 5.613 or so, but not to the 8.1 maximum of uniform acceleration), one adds only 66' or so to the automobile's distance away.
One may still blame the automobile driver for not having timely realized the van's intent to cross into his far right lane, though not necessarily from the second that the van started to move into the far left lane. (The expert testified that it could have taken the van as long as ten seconds to reach the far right lane. We have rejected his calculations, but there would have been at least a second or two during which it would not have been obvious that the van was going to cross the other two lanes of the highway and turn into the automobile's lane.) The automobile driver very probably should have realized, at a time when he still could have responded safely, that the van was entering his lane. But his failure to do so does not exculpate the van driver. The van driver's duty not to enter a lane when it is not reasonably safe to do so because of an approaching vehicle includes, within the risks it seeks to avoid, the risk that a driver who has not much more than a minimally reasonable, mathematically demonstrable opportunity to stop or sufficiently slow may not use that opportunity, because of inattention, inexperience or other foreseeable cause. The van driver breached that duty and the failure by the automobile's 15-year-old driver to compensate for the van driver's breach by braking immediately, or at least quickly, may put him at fault but it does not excuse the van driver's fault. As between the two drivers, even, comparative negligence might apply. But as to innocent third persons injured by their collision or near-collision, each driver is liable in solido.

Decree
The judgment appealed from is affirmed insofar as it dismissed Elton J. King's action, but reversed insofar as it dismissed the mother's demand against the van driver and her insurer. There is judgment for Nancy H. King for $300,000 against Linda Nicholson and, to the extent of its $200,000 limit for injury to more than one person, against United Services Automobile Association, in solido with each other and with the previously cast defendants, with interest from judicial demand and all costs.